IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CYNTHIA A RINI, ) | CASE NO. 1:18CV1462 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE JAMES S. GWIN |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Cynthia Rini ("Rini") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**I. Procedural History**

In July and September 2015, Rini filed applications for DIB and SSI, respectively, alleging a disability onset date of January 1, 2010. Tr. 11. She alleged disability based on the following: ADHD, anxiety, sleep disorders, fibromyalgia, and severe recurrent major depression. Tr. 263. After denials by the state agency initially (Tr. 100, 101) and on reconsideration (Tr. 126, 127), Rini requested an administrative hearing. Tr. 158. A hearing was held before an Administrative Law Judge ("ALJ") on June 28, 2017. Tr. 28-75. At the hearing, Rini amended her alleged onset date to February 1, 2014. Tr. 44-45. In her November 30, 2017, decision (Tr.

11-21), the ALJ determined that there are jobs that exist in the national economy that Rini can perform, i.e., she is not disabled. Tr. 20-21. The Appeals Council denied Rini's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Rine was born in 1974 and was 39 years old on her alleged onset date. Tr. 259. She has an associate's degree. Tr. 31. She worked in quality assurance as a software tester for thirteen years at Progressive Insurance and as a solutions analyst selling software for a technology company; she last worked in 2016 selling fragrances at a kiosk in a mall. Tr. 32, 33-34, 43, 68.

### B. Relevant Medical Evidence[1]

In February 2012, Rini restarted treatment with Douglas McLaughlin, D.O., for depression, anxiety, and ADHD; she had not seem him for about a year. Tr. 302. She reported that she had not worked in two years and that she needed to get a job and stay focused. Tr. 302. She was taking Klonopin and Prozac but had run out of her Ritalin and wanted to restart it. Tr. 302. She also reported erratic sleep patterns. Tr. 302. Upon exam, she was alert and oriented, calm and pleasant, and "seem[ed] dysthymic, mood 'a little bit seclusive [sic] to home.'" Tr. 302. She received support from friends and had a good sense of humor about her. Tr. 203. She denied suicidal or homicidal ideation, hallucinations, and paranoid thinking. Tr. 302. Dr. McLaughlin renewed her medications and restarted her on Ritalin. Tr. 302.

In July 2013, Rini returned to Dr. McLaughlin stating that she needed help with her fatigue. Tr. 306. She reported that she had been diagnosed with delayed sleep phase syndrome in 2009 and asked about treatment options other than stimulants. Tr. 306. She expressed

---

[1] Rini only challenges the ALJ's decision with respect to her mental impairments. Thus, only the medical evidence that relates to her mental impairments is summarized and discussed herein.

concern over losing her new job; she worked 8-5pm in information technology (IT) for a technology company. Tr. 306. She was compliant with her Prozac and Klonopin (which she took sparingly) and she had stopped taking Ritalin. Tr. 306. She did not have a therapist and was "not interested" in therapy. Tr. 306. Upon exam, she had an euthymic mood, full and appropriate affect, normal concentration, intact memory, intact associations, and clear, distinct speech. Tr. 306. Dr. McLaughlin diagnosed depression and insomnia, discontinued her Ritalin, started a trial of Nuvigil for her sleep disorder, and assessed a global assessment of functioning score (GAF) of 51-60.[2] Tr. 306-307. He recommended she follow up as needed.

Rini returned to Dr. McLaughlin in February 2014. Tr. 310. She reported that she had lost her job in the fall. Tr. 310. She asked about pursuing disability and stated that she could not work or focus and had been late to work. Tr. 320. She was working a few hours a week selling perfume. Tr. 320. She last took Nuvigil several months earlier after she had lost her job, noting it was expensive but effective. Tr. 320. She did not have a therapist and was not interested in therapy. Tr. 310. Upon exam, she was calm, cooperative, and pleasant; her memory was mildly impaired; her concentration was poor and she was easily distracted; she had intact associations and an appropriate fund of knowledge; her mood was anxious and distressed but she "maintains sense of humor and sarcasm;" and her affect was "full and appropriate to topic." Tr. 311. The treatment note states that her speech was clear and distinct and her thought process was logical, coherent and rational; it also states that her speech was pressured with tangential/disorganized thought process. Tr. 311. Dr. McLaughlin diagnosed mood and anxiety symptoms, ADHD, and

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

sleep disorder and assigned a GAF of 45.[3]  Tr. 311.

Rini failed to show for her April 2, 2014, appointment with Dr. McLaughlin and returned on April 28.  Tr. 314, 216.  She was no longer pursuing disability, having started a part-time job at a mall.  Tr. 316.  She stated that she needed help with her medication; she was still tired with poor focus.  Tr. 316.  Her examination findings were the same as her prior visit and she again received a GAF score of 45.  Tr. 317-318.  Dr. McLaughlin increased her Prozac, continued her Nuvigil, added a trial of Trazadone for sleep, and recommended she taper, then discontinue, her Klonopin.  Tr. 317.  She was to follow up in four weeks.  Tr. 317.  She was not interested in therapy.  Tr. 316.

Rini returned to Dr. McLaughlin on September 3, 2014.  Tr. 320.  She reported doing okay but needing to talk about a few things.  Tr. 320.  She was not pursuing disability, was no longer working, and was on unemployment.  Tr. 320.  She was not interested in therapy.  Tr. 320.  Her mood was "not bad today" and she was calm, cooperative, and pleasant.  Tr. 322.  She reported that her insomnia persisted and that she had discontinued Trazodone on her own because it had not helped.  Tr. 320.  She asked to restart ADHD medication because she felt distracted.  Tr. 320.  Upon exam, her memory was mildly impaired; her concentration was poor and she was easily distracted; she had intact associations and an appropriate fund of knowledge; her mood was anxious and distressed but she "maintains sense of humor and sarcasm;" and her affect was "full and appropriate to topic."  Tr. 311.  The treatment note states that her speech was clear and distinct and her thought process was logical, coherent and rational; it also states that her speech was anxiety driven and pressured with tangential thought content "per her usual."  Tr. 321.  Her behavior was "restless, laughs out loud."  Tr. 321.  Dr. McLaughlin wrote, "referral to

---

[3] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR, at 34.

therapist again today—[patient] agrees to go to new therapist." Tr. 321. He assigned a GAF of 45, added Seroquel for sleep and anxiety, and asked for her to return in four weeks. Tr. 321-322.

Rini returned to Dr. McLaughlin on January 28, 2015. Tr. 325. She reported doing better and sleeping better with Seroquel. Tr. 325. She had no therapist and was not interested in therapy. Tr. 325. She was again asking for ADHD medication. Tr. 325. She was planning on moving in with her boyfriend. Tr. 325. Her exam findings were as her prior visit, other than her behavior was listed as "restless, laughs out loud, giggles—baseline." Tr. 325-326. Her medications were continued and she was to follow up as needed. Tr. 326.

Rini returned to Dr. McLaughlin on June 24, 2015. Tr. 329. She stated, "I'm doing better." Tr. 329. She was considering disability again; she was not working full time and worked part time selling perfume at a mall (5 hours a day "here and there"). Tr. 329. She stated, "I can't wake up and get to work. I have so many physical issues...I can't work." Tr. 329. She was still planning on moving in with her boyfriend in a different town. Tr. 329. Her exam findings were the same as her prior visit. Tr. 330. Dr. McLaughlin continued her medications and advised she follow up with her primary care physician after reviewing her recent bloodwork. Tr. 330.

Rini saw Dr. McLaughlin on October 19, 2015. Tr. 348. She had had a recent fibromyalgia diagnosis. Tr. 348, 393. She was working with an attorney pursuing disability. Tr. 348. She reported her anxiety was high, she could not focus, she remained distracted, and sleep was a chronic issue for her. Tr. 348. She reported that she had discontinued Seroquel on her own; although it helped her sleep, it made her congested. Tr. 348. She stated that the Nuvigil made her neck stiff. Tr. 348. Her exam findings were the same as her prior visit. Tr. 349. She stated that she needed to restart her ADHD medication. Tr. 350. Dr. McLaughlin gave her a

5

trial of Ambien to help with sleep and, if that failed, Belsoma. Tr. 349.

Rini saw Dr. McLaughlin on February 23, 2016, reporting that her anxiety exhausts her but that the Ambien was working. Tr. 371. She again complained that she could not focus, her anxiety was high, she remained distracted, and that sleep was a chronic issue for her. Tr. 371. She still had neck pain. Tr. 371. Her mood was "not bad today," her affect dysthymic, she was calm, cooperative and pleasant, and she had a tangential thought process. Tr. 372.

On June 8, 2016, Rini reported that her mood was "really down." Tr. 408. She had been "really depressed and stressed lately." Tr. 410. In addition to her prior complaints, she admitted to having thoughts that life was not worth living. Tr. 408. She did not have a therapist and was not interested in therapy. Tr. 408-409. Upon exam, she had a mild memory impairment; her concentration was poor and she was easily distracted; she had intact associations and an appropriate fund of knowledge; her mood was anxious and distressed but she "maintains sense of humor and sarcasm;" and her affect was flat, sad and depressed. Tr. 409. The treatment note states that her speech was clear and distinct and her thought process was logical, coherent and rational; it also states that her speech was soft and slow and her thought content tangential "per her usual." Tr. 409. Her behavior was calm, cooperative and pleasant. Tr. 410. Dr. McLaughlin added Abilify and her GAF remained 45. Tr. 409-410.

Rini returned on June 27 and told Dr. McLaughlin, "I think I like that Abilify." Tr. 415. Her sleep was erratic—only four hours a night—but, on the plus side, she was less depressed. Tr. 415. She was less anxious and more focused and reported that she had been able to read half of a book. Tr. 415. Her exam findings were the same as her prior visit except that she had a "better" mood, full affect, and no speech abnormalities noted. Tr. 415. Dr. McLaughlin discontinued her Ambien, started her on Sonata, and increased her Abilify. Tr. 416-417. Her

6

GAF remained a 45.  Tr. 417.

Rini saw Dr. McLaughlin on August 3, 2016, reporting that she still has sleep problems.  Tr. 418.  The Sonata helped a bit but it was still not quite enough.  Tr. 418.  She reported that a close friend had died in her sleep.  Tr. 418.  She had been put on Topomax by her neurologist for headaches and stated that she likes this medication and that it helped stabilize her mood and "keep my brain even."  Tr. 419.  Her exam findings were the same as her prior visit.  418-419.  Dr. McLaughlin increased her Sonata.  Tr. 419-420.  Rini returned on August 31; she reported that she was tired all the time and stressed about finances.  Tr. 421-422.  She had not increased her Sonata.  Tr. 422.  Her exam findings were the same as her prior visit.  Tr. 421-422.  Dr. McLaughlin increased her Abilify.  Tr. 422.

On September 21, 2016, Rini saw Dr. McLaughlin and reported that she had no motivation or emotions lately.  Tr. 424.  She reported that her mood was "not bad" and "more even at work."  Tr. 425.  Her exam findings were the same as her prior visit.  Tr. 424-425.  Dr. McLaughlin decreased her Abilify due to her blunted affect.  Tr. 425.

Rini did not show for her November 1, 2016, appointment.  Tr. 428.

On January 16, 2017, Rini again reported having no motivation or emotions lately.  Tr. 436.  Dr. McLaughlin commented that she was supposed to have decreased her Abilify but that "she has simply not been taking it at all."  Tr. 437.  Dr. McLaughlin restarted it to treat her mood and increased her Topomax.  Tr. 437, 439.  She did not have a therapist and was not interested in therapy.  Tr. 437.

On February 16, 2017, Rini told Dr. McLaughlin that she was doing okay and that her sleep was better.  Tr. 440.  She felt like the Topamax gave her energy.  Tr. 440.  She had stopped taking her Abilify because she feared weight gain.  Tr. 440.  Upon exam, her mood was nervous

7

and anxious although she maintained her sense of humor and sarcasm. Tr. 441. Her other exam findings were as they had been and her GAF score remained 45. Tr. 440-442. Dr. McLaughlin noted that she was "on Remeron???" and increased her Remeron for her mood, anxiety, and sleep. Tr. 440-441.

### C. Opinion Evidence

#### 1. Treating source

On March 9, 2016, Dr. McLaughlin completed a form titled "Assessment of Ability To Do Work Related Activities (Mental)" on Rini's behalf. Tr. 375-376. Dr. McLaughlin stated that he had been treating Rini since 2004, that her medications had a "moderate" effect on her ability to function, and that she had been diagnosed with anxiety, ADHD, sleep disorder, and major depression. Tr. 376. Dr. McLaughlin opined that Rini had "extreme" limitations in: maintaining concentration and attention for extended periods; understanding, remembering, and carrying out instructions; performing activities within a schedule, maintaining regular attendance, and being punctual; and behaving "in an emotionally stable manner." Tr. 375-376. She had "marked" limitations in: relating to others; sustaining a routine without special supervision; responding to customary work pressures; responding appropriately to changes in the work setting; and performing "complex, repetitive, or varied tasks." Tr. 375-376. She had "moderate" limitations in her ability to respond appropriately to supervision and co-workers and to use good judgment; and "mild" limitations in her ability to perform simple tasks and daily activities. Tr. 375-376. Her condition likely would deteriorate if she were under the stress of "even simple, routine work" and she likely would be absent from work three times per month. Tr. 376. Asked for additional comments, Dr. McLaughlin wrote, "see progress notes." Tr. 376.

On May 22, 2017, Dr. McLaughlin completed a form titled Medical Statement

Concerning Depression, Bipolar and Related Disorders. Tr. 445. He opined that, due to her depressive disorder, Rini had "extreme" limitations in her ability to understand, remember, or apply information; concentrate, persist, or maintain pace at tasks; and adapt or manage herself; and she had "moderate" limitation in her ability to interact with others. Tr. 445.

### 2. State Agency Reviewers

On October 16, 2015, state agency reviewing psychologist Tonnie Hoyle, Psy.D., reviewed Rini's record and opined that she was no more than moderately limited in any area of functioning and could perform simple, routine, one- to three-step tasks in a work environment without frequent change, relate adequately on a superficial basis with co-workers and supervisors, and could have occasional contact with the public. Tr. 83-85. On December 23, 2015, state agency reviewing psychologist Courtney Zeune, Psy.D., affirmed Dr. Hoyle's opinion. Tr. 111.

### D. Function Report

#### 1. Rini's report

On November 6, 2015, Rini completed a function report. She stated, "I have been fired from multiple jobs due to my inability to get enough sleep to adhere to a regular schedule. I cannot focus on assignments or tasks. Any additional work related stress causes extreme anxiety and depression which makes me sleep even more." Tr. 270. She can only do small, short chores: "Large chores take several days. I do not cook so I eat purchased or prepared meals." Tr. 271. She reiterated that her inability to sleep is a "SEVERE" issue for her, explaining that she needs 12-16 hours of sleep to function, she takes frequent naps, and still never feels rested or refreshed. Tr. 271. She only gets dressed when she has to leave the house, bathes one to two times per week, and no longer gets her hair cut on a regular basis. Tr. 271. Her boyfriend and

sisters remind her to take care of her personal hygiene and to take her medications. Tr. 272. She has difficulty shopping and goes once per month; she "can only buy a few items at a time before I lose all energy and have to return home." Tr. 273. Basic tasks like laundry and vacuuming take much longer than they should because she cannot stay focused. Tr. 272. She does not have any hobbies because she "can't focus well on any detailed hobbies." Tr. 274. She reports difficulty following instructions and needs to be able to write down spoken instructions. Tr. 275. Stress causes her to shut down and not complete what she was working on. Tr. 276.

### 2. Keyes's report

On June 30, 2017, Rini's boyfriend wrote a letter in which he stated that he met Rini when they were both working as information technology professionals at the same company. Tr. 300. She was frequently absent or late for work and he later learned that it was due to her depression. Tr. 300. Over time, her condition has deteriorated to the point she cannot perform even low responsibility jobs. Tr. 301.

### E. Testimonial Evidence

### 1. Rini's Testimony

Rini was represented by counsel and testified at the administrative hearing. Tr. 29-30. She testified that she was unable to work because she is unreliable due to her sleep problems. Tr. 36. No matter how hard she tries, she can't be reliable to make it on time to work or anywhere. Tr. 36. Also, she has depression, so she can sleep for 18 hours. Tr. 36. She can sleep and not leave the house for a week. Tr. 36. She has had sleep problems for a long time. Tr. 36. She went to the Cleveland Clinic Sleep Disorder Center trying to figure out why she was always so tired. Tr. 36. She had ADHD and the medication for that would make her inability to sleep worse. Tr. 36. She has no way of controlling her sleep disorder. Tr. 37. She is unable to make

10

it to work every day or to not feel a need to sleep once there (e.g., leave at lunchtime), and the more this happens the more depressed she gets. Tr. 37. When asked what special arrangements she made to get to the hearing, Rini stated that she had fallen asleep at 3:00 a.m. and woke up at 5:00 a.m. Tr. 37. She made sure her boyfriend woke up at 9:00 a.m. and that she was up in case anything happened. Tr. 37. With something high profile like a hearing, she ends up not sleeping because she is nervous she is going to miss it. Tr. 37-38.

When asked how often her sleep disorder affects her, Rini stated that every day is a different day. Tr. 48. She has no control over it; she may be stressed by anything, like a conversation or a phone call. Tr. 48. She can celebrate Christmas Eve with family but then will sleep all day on Christmas; she can never do two days in a row. Tr. 48. It is every week, every day; some days she sleeps 18 hours. Tr. 48. Her longtime psychiatrist is Dr. McLaughlin, who treats her depression. Tr. 48. She also has ADHD. Tr. 48. She can't take any medication for her ADHD, however, because it affects her sleep. Tr. 49. She also has insomnia so she cannot fall asleep. Tr. 49. She takes sleeping pills but they only allow her to sleep for four hours. Tr. 49. She went to the Cleveland Clinic for her sleep problems before 2010, when she was still working at Progressive, and they diagnosed her with Delayed Sleep Phase Syndrome, which means that her circadian rhythm is off.[4] Tr. 50. Her sleep disorder "would be okay if I didn't have depression where I would sleep ... for [] days[.]" Tr. 50. She did everything they told her to do—used the white light they gave her and took melatonin—but she still couldn't get to work on time. Tr. 51. She took FMLA leave while working at Progressive but could not comply with the reporting in order to come in late. Tr. 51. She would just fall back asleep because it was just more pressure on her. Tr. 51. She could not wake up because she felt like she was drugged. Tr. 55-56.

---

[4] As the ALJ pointed out during the hearing, there are no sleep disorder notes in the record. Tr. 49.

11

The ALJ asked whether her sleep disorder was secondary to her depression, whether her depression was secondary to her sleep disorder, or whether these are separate problems.  Tr. 51-52.  Rini explained that, if she could fall asleep early and wake up the next day, then that would be one problem.  Tr. 52.  Her problem is that she can't wake up and she never knows when she is going to wake up.  Tr. 52.  Her depression makes her tired.  Tr. 52.  Her parents are deceased; her mom died in 2010, and when her mom died she just lost the "cushion"—the ability to keep making it and taking it in stride.  Tr. 53.  She can't do it anymore.  Tr. 53.

Rini stated that she lives in a house with her boyfriend.  Tr. 46.  Because of her ADHD, she has no hobbies, she interrupts herself when she talks, and she doesn't read.  Tr. 54.  When asked how she fills her time when she is awake, Rini answered that she doesn't do anything, she just sits there and is numb.  Tr. 55.  She watches television.  Tr. 55.  She does not leave the house a lot but she drives to her doctor appointments.  Tr. 55.  When asked if she has a support system that helps her get to appointments or events, Rini stated that her mom used to call her before work every morning.  Tr. 55.  When asked who does the chores in the house, Rini stated that she does.  Tr. 57.  She does them when she is awake and can handle it, although she will start something and then has to go lie down.  Tr. 57.

Rini has one or two days every week when she will sleep the whole day, 18 hours.  Tr. 58.  She wakes up not rested at, say, 5:00 p.m., and then she will go to bed as if she were tired and exhausted from performing hard labor all day.  Tr. 58.  She is compliant with her medications and takes them when she is awake: Prozac (depression), Topamax (headaches), sleeping pills, and Klonopin (anxiety).  Tr. 58.  If she sleeps 18 hours she ends up not taking them.  Tr. 59.  She tries to have it so that every morning she has her medication ready on her dresser so it is automatic, and then she takes them before she goes to bed.  Tr. 59.  The Topamax

makes her more alert and that is why she needs the sleeping pills. Tr. 63.

Rini was diagnosed with ADHD about thirteen years ago, while working at Progressive. Tr. 60. She always knew something was wrong with her, and she figured it out when the internet made information like that available. Tr. 60. When asked how she was able to be very good at her very technical job while having ADHD when her mind wanders, Rini stated that it was because she was always working on new jobs that she started; it wasn't something she had to follow guidelines for. Tr. 60. She was always interested in what she did and that helped her pay attention. Tr. 60-61.

When asked what causes her fatigue, Rini stated that she has had fatigue and depression her whole life, and she struggled with the sleeping and being on time her whole career. Tr. 63. When asked what made her get worse, Rini stated that he mother got sick and died in 2010. Tr. 66. When asked if she has spoken to anyone about her feelings regarding the death of her mother, Rini did not answer, i.e., she had not spoken to anyone about her bereavement issues. Tr. 66-67.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 68-72. The ALJ asked the VE to determine whether a hypothetical individual of Rini's age, education and work experience could perform Rini's past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform Rini's past work but could perform other jobs in the national economy such as inspector/hand packager, routing clerk, and marker. Tr. 68-71.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her November 30, 2017, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2018. Tr. 14.

2. The claimant has not engaged in substantial gainful activity since February 1, 2014, the amended alleged onset date. Tr. 14.

3. The claimant has the following severe impairments: headaches/tremors, cervical disc disease, fibromyalgia, depression, anxiety, and attention deficit hyperactivity disorder (ADHD). Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 14.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes or scaffolds. The claimant can frequently climb ramps/stairs, balance, kneel, and crawl. She can occasionally stoop and crouch. The claimant retains the ability to understand and remember simple, repetitive tasks in a setting without fast pace or high production requirements. She retains the ability to interact superficially with co-workers, supervisors and occasionally interact superficially with the general public. The claimant has the ability to adapt to a work setting where changes are occasional and minor. Tr. 17.

6. The claimant is unable to perform past relevant work. Tr. 19.

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.         The claimant was born in 1974 and was 39 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date. Tr. 20.

8.         The claimant has at least a high school education and is able to communicate in English. Tr. 20.

9.         Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 20.

10.        Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exits in significant numbers in the national economy that the claimant can perform. Tr. 20.

11.        The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2014, through the date of this decision. Tr. 21.

### V. Plaintiff's Arguments

Rini argues that the ALJ failed to follow the treating physician rule with respect to Dr. McLaughlin's opinions. Doc. 12.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ gave "little" weight to Dr. McLaughlin's opinions. Tr. 19. The ALJ explained that Dr. McLaughlin prescribes Rini's medications but that Rini is not in counseling. She noted that, although Dr. McLaughlin opined that Rini had extreme limitations in various domains, he has never recommended a psychiatric hospitalization. Rini lives with her boyfriend and interacts with her family, drives, cares for a pet, and performs household chores. Additionally, the ALJ explained that Dr. McLaughlin's opinions were in contrast to the state agency reviewers, who found that she could perform simple, routine, 1-3 step tasks in a setting with no frequent change and can relate superficially with supervisors, coworkers and the public; opinions that the ALJ gave great weight to. Tr. 19. Elsewhere in her decision, the ALJ noted that Dr. McLaughlin was a psychiatrist who had treated Rini since 2004 and she detailed his exam findings extensively.

Tr. 15-17.

Rini argues that the ALJ "never conducted the controlling weight analysis" with respect to Dr. McLaughlin's opinions because she "did not compare the underlying objective psychiatric findings of record to the content of Dr. McLaughlin's opinions." Doc. 12, pp. 10-11. While true that the ALJ did not compare the underlying objective exam findings to the content of Dr. McLaughlin's opinions, neither did Dr. McLaughlin. Dr. McLaughlin provided no explanation for any of his findings; the closest he came was merely stating "See progress notes." Tr. 376. The ALJ discussed in detail Dr. McLaughlin's exam findings found in his progress notes. Tr. 16. The ALJ found that these exam findings did not show that Rini had extreme limitations. Tr. 17. This analysis was not erroneous.

Rini complains that the ALJ considered whether she had ever been hospitalized, asserting, "It is unclear why the ALJ felt Ms. Rini needed to be committed by Dr. McLaughlin in order to credit his professional opinion." Doc. 12, p. 11. But the fact that Dr. McLaughlin had never recommended a psychiatric hospitalization is evidence in the record that undermines his opinion that she had various extreme limitations. *Wilson*, 378 F.3d at 544 (an ALJ considers whether the opinion of a treating source is consistent with the other substantial evidence in the case record). So, too, the ALJ's reliance upon the fact that Dr. McLaughlin routinely recommended that Rini undergo counseling and the fact that Rini routinely stated that she was not interested in counseling. *See, e.g., Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 631 (6th Cir. 2016) (conservative treatment is a "good reason" to discount treating opinion); *Kelso v. Comm'r of Soc. Sec.*, 2019 WL 1033642, at *10 (S.D.Ohio March 5, 2019)[6] (claimant's failure to pursue treatment is a good reason for discounting treating source opinion, relying on *Strong v. Soc. Sec. Admin.*, 88 Fed. App'x 841, 846 (6th Cir. 2004)).

---

[6] Report and Recommendation adopted, 2019 WL 1384881 (March 27, 2019).

18

Finally, Rini contends that the ALJ erred when she cited Rini's activities because it is unclear how her ability to perform these activities conflicts with Dr. McLaughlin's opinions, and that Rini's ability to perform these activities is not "intact." Doc. 12, pp. 11-12. In support, she relies on *Melendez v. Comm'r of Soc. Sec.*, 2014 WL 2921938 (N.D.Ohio June 27, 2014). But in *Melendez*, the court found that the ALJ erred because the *only* reason given for discounting a treating source opinion was the claimant's activities of daily living. *Id.*, at \*6. If the ALJ had cited Rini's activities of daily living as the only reason for discounting Dr. McLaughlin's opinions, the explanation would have been incomplete. But the ALJ gave two additional reasons for discounting McLaughlin's opinions; *Melendez*, therefore, is not on point.

In sum, the ALJ did not violate the treating physician rule. Therefore, her decision must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion, even when substantial evidence may support the claimant's position).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: May 17, 2019

  */s/ Kathleen B. Burke*

  Kathleen B. Burke
  United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).